UNITED STATES DISTRICT COURT
THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| REV. FR. EMMANUEL LEMELSON a/k/a GREGORY M. LEMELSON, | | |
| Plaintiff, | | |
| v. | | No. 4:15-cv-40082-TSH |
| JASON D. LEMELSON, | | **HEARING REQUESTED** |
| Defendant. | | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT JASON D. LEMELSON'S MOTION TO DISMISS COMPLAINT**

This lawsuit arises out of an alleged business relationship between two brothers: Gregory M. Lemelson ("Fr. Emmanuel") and Jason Lemelson ("Jason") (collectively, the "Lemelson Brothers"). *See* Compl. ¶¶ 1-2 (Dkt. # 1). Fr. Emmanuel asserts that he is entitled to damages in excess of $7 million for providing investment advice to Jason and "managing" less than $7 million worth of Jason's investments for less than 12 months and because Jason "unilaterally aborted [the Lemelson Brothers'] efforts to form and operate a hedge fund"[1] and instead founded his own hedge fund. Fr. Emmanuel's claims, together with the contradictory allegations that purportedly support them, fail to state a legally cognizable theory and, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, should be dismissed with prejudice.

Fr. Emmanuel's claims can be broken into two categories: those seeking compensation for Jason's failure to pay Fr. Emmanuel for services rendered (Counts I through III) and that seeking compensation for Jason's failure to form a hedge fund with Fr. Emmanuel (Count IV). Counts I through III fail for two primary reasons. First, the subject matter of the purported contract—compensation for the provision of investment

---

[1] Compl. ¶ 71.

advice and management of investment accounts—is highly regulated, and *Massachusetts law prohibits both oral contracts for compensation for investment management and/or advice and any compensation for unregistered investment advisers*. *See* Section II.B.1. Second, even if those regulations did not apply, Fr. Lemelson cannot state a claim because the emails that Fr. Emmanuel relies on as the basis of his claims demonstrate that he *repeatedly stated* during the relevant time period that *he neither expected nor wanted any compensation*—in other words, the Lemelson Brothers never entered into a contract and Fr. Emmanuel did not have a reasonable expectation of compensation. *See* Section II.B.2-4.  Nor does the Complaint sufficiently allege that Jason could have reasonably expected to pay Fr. Emmanuel a fifty-percent performance fee.  *Id.*

Count IV similarly fails because the parties did not proceed beyond the negotiation phase to manifest their intent to enter into a partnership on specified terms. *See* Section II.C.  Moreover, even if they had entered into a partnership, Jason did not owe Fr. Emmanuel a fiduciary duty not to terminate any purported agreement or to avoid making alleged misrepresentations after the purported partnership had indisputably been terminated.  *See id.*

## I.       Summary of Plaintiff's Factual Allegations[2]

### A.     2010-2011:  Fr. Emmanuel Begins Providing Investment Advice to the General Public and Jason

In 2010, Fr. Emmanuel began to invest "aggressively" in securities and to "publish in-depth security analysis and research reports on various stocks."  Compl. ¶ 6.

---

[2] This recitation of the facts is based both on the Complaint and emails between Fr. Emmanuel and Jason that are incorporated by reference.  The exhibits to the Garcia and Lemelson Declarations are properly before the Court on a motion to dismiss because Fr. Emmanuel incorporated them by reference in his Complaint and/or they are subject to judicial notice.  *See* Section II.A. *infra*.  Jason reserves the right to contest any of the allegations pleaded.

That material was publicly available on the Internet, including on Fr. Emmanuel's own website, amvona.com. *See id.*; *see also* Declaration of Heidi Craig Garcia, July 14, 2015 ("Garcia Decl."), Exs. 1-5. Jason was familiar with Fr. Emmanuel's investment philosophy and specific research, having read Fr. Emmanuel's articles and research reports, which Fr. Emmanuel frequently emailed to Jason. *See, e.g.*, Declaration of Jason D. Lemelson, July 14, 2015 ("Lemelson Decl."), Ex. A; Compl. ¶ 7. Fr. Emmanuel would also recommend that Jason purchase specific securities, many of which Fr. Emmanuel had already written about. *See, e.g.*, Garcia Decl. Exs. 1-5; Lemelson Decl. Ex. B; Compl. ¶¶ 9, 12.

On August 11, 2011, Fr. Emmanuel emailed Jason links to two articles he had published regarding Cisco, which Fr. Emmanuel reported was up about 17%. Lemelson Decl. Ex. A. In response, Jason acknowledged that he had "lots of Cash sitting around" and said that he would "carve out some time to start taking your stock advice and doing some research." *Id.*; Compl. ¶ 8. Jason made his first purchase of a stock about which Fr. Emmanuel had written—Force Protection, Inc. ("FRPT")—on or about October 5, 2011. Lemelson Decl. Ex. C; Compl. ¶ 9. The Complaint asserts that at some point prior to the purchase, Fr. Emmanuel stated that he expected a fifty percent (50%) performance fee on the realized profits, but it does not allege that a compensation agreement was made at that time. Compl. ¶ 9.

Over the next couple of months, the Lemelson Brothers discussed several other potential trades, at least some of which Jason made. *See, e.g.*, Lemelson Decl. Ex. D; Compl. ¶ 11. When Jason made a trade, Fr. Emmanuel would request the details of the trade so that he could track Jason's investments. *See, e.g.*, Lemelson Decl. Ex. D; Compl. ¶¶ 12, 15. Through this method, Fr. Emmanuel was able to build up a partial understanding of Jason's holdings, although he did not have access to or specific

knowledge of the remainder of Jason's portfolio.  *See, e.g.*, Lemelson Decl. Ex. B ("[I]f you want to purchase – suggest 200k [until we have a chance to review your whole portfolio.]").

In December 2011, Jason increased the amount of money in his portfolio that could be used to purchase equity securities by $950,000.  Lemelson Decl. Ex. E; Compl. ¶ 16.  But the total amount allocated towards equities only represented about half of Jason's overall portfolio.  Lemelson Decl. Ex. E.  The rest of his wealth remained in fixed income, a class of securities about which Fr. Emmanuel did not advise.  *See id.*

**B.     January to April 2012: Conflict Over Control of and Compensation for Jason's Portfolio**

Initially, the relationship between the Lemelson Brothers as it related to Jason's portfolio was one of informal information sharing.  By his own admission, Fr. Emmanuel viewed their relationship as one of teacher and student, not investment manager and client.  Lemelson Decl. Ex. F ("Teaching as you know is about the joy of being part of peoples [sic] learning and development . . . .").  Thus, Fr. Emmanuel would share analysis and recommendations with Jason, and Jason would sometimes act on them.  But Jason also allocated capital without his brother's input and managed his own portfolio—activities that Fr. Emmanuel fully supported, at one point saying he was "*glad to hear you[, Jason,] made the decision to manage  your funds yourself afterall* [sic] - there is no better way to get experience."  Lemelson Decl. Ex. J (emphasis added).

But the correspondence between the Lemelson Brothers indicates an increasing tension between them that became palpable in January 2012.  *See* Lemelson Decl. Ex. F. Jason was grateful for the knowledge obtained from Fr. Emmanuel and the gains made as a result, and even offered to compensate Fr. Emmanuel for his efforts.  *See, e.g.*, Lemelson Decl. Ex. G ("Will you accept performance based compensation for managing

the capital?"); Compl. ¶ 26.  But he also specifically requested that Fr. Emmanuel not provide him with individualized analysis akin to what an investment adviser might provide because Jason could do that work himself:

> I agree the resutls [sic] in a very short period have been terrific and am grateful.  As I liquidate positions and re-allocate I am certainly feeling better.  I did want to explicitly mention that providing these breakdowns isn't necessary.  *I know you are extremely busy and don't feel any extra effort should be put into this level of analysis.*  I am compiling investment returns and analysis and know how the issues are performing.  Once we recognize gains it is very straightforward to see the overall gain in % terms and I am watching the positons [sic] daily.  *I don't want extra effort conducted on my behalf!  I will go through monthly or quarterly and continue to update performance and run reports if the Schwab reports aren't sufficient.*

Lemelson Decl. Ex. F (emphasis added).  To that end, Jason reminded his brother on numerous occasions that he was directing his investments, not Fr. Emmanuel.  *See, e.g.*, *id.* (in which Jason states that he was "self-directing" his portfolio and Fr. Emmanuel describes Jason's approach as "ad hoc" and "informal").  Nevertheless, on January 11, 2012, in an apparent attempt to appease Fr. Emmanuel, Jason agreed to allocate a portion of his portfolio "towards a value strategy that [Fr. Emmanuel was] directing."  *Id.*; Compl. ¶ 23.  Neither the specific amount that Fr. Emmanuel would "direct" nor the percentage of Jason's portfolio that amount would represent were agreed to.  *Id.* (providing only that "*up to*" $4 million would be allocated).  Nor was there any discussion of compensation for Fr. Emmanuel at that time.  *See id.*

A few months later, Jason offered to compensate Fr. Emmanuel for his efforts.  *See, e.g.*, Lemelson Decl. Ex. G; Compl. ¶ 26.  He did not state how much he intended to pay or propose a formula for determining the amount of compensation.  Lemelson Decl. Ex. H; Compl. ¶ 26.  But Fr. Emmanuel refused the offer and declined *any* compensation.  *See, e.g.*, Lemelson Decl. Ex. H ("*Because you have indicated that you feel strongly*

*about paying a management/performance fee -- (which of course we have declined*),
[making a donation to Fr. Emmanuel's church] may be a good opportunity for you to
satisfy your desire . . . .") (emphasis added); Ex. I ("I thought the strategy was
clear.........you allocate the capital *and I'd transfer performance compensation against
your will*:)") (emphasis added); Compl. ¶ 30.[3]

**C.     March to April 2012: Brief Discussions Regarding Forming a Hedge Fund**

At approximately the same time that Jason offered to compensate Fr. Emmanuel
for his assistance with Jason's personal portfolio, the Lemelson Brothers began
discussing the possibility of starting a hedge fund together, to be known as "The
Lemelson Partnership" or "Lemelson Partners."  Lemelson Decl. Ex. J; Compl. ¶¶ 29, 70.
Jason offered to "participate in the initial set-up fees," but (consistent with his response to
offers for compensation from Jason) Fr. Emmanuel declined the offer.  Lemelson Decl.
Ex. J; Compl. ¶ 29.  The hedge fund, however, was never established, and although the
parties "discussed costs, operations, potential names, development and overall strategies
for the hedge fund," there is no allegation that they reached agreement on any of those
terms.  Compl. ¶ 29.

**D.     May to July 2012:  Deterioration and Termination of Relationship**

The relationship between the Lemelson Brothers rapidly deteriorated in mid-May
2012, *see* Lemelson Decl. Ex. K; Compl. ¶ 38, but Jason did not completely terminate the
alleged "investment management" relationship between them at that time.  Over the
course of the next six weeks, Fr. Emmanuel continued to send Jason articles containing

---

[3] Fr. Emmanuel's allegation that he and Jason "orally agreed that Jason would
compensate Father [Emmanuel] with a performance fee of fifty percent (50%) of any
gains from Father [Emmanuel]'s investments and management of Jason's portfolio,"
Compl. ¶ 26, is flatly contradicted by these emails.  As such Fr. Emmanuel has no good
faith basis for making such an allegation.

Fr. Emmanuel's securities analysis and encouraged Jason to purchase certain stock.[4] Lemelson Decl. Ex. L; *see also* Compl. ¶ 41.  As in the past, Jason purchased some of the recommended stock, but did not follow all of Fr. Emmanuel's recommendations. Lemelson Decl. Ex. L.  Additionally, on or about June 1, Jason opened a new brokerage account at TD Ameritrade after Fr. Emmanuel advised Jason lower margin interest rates were available through TD Ameritrade.  Lemelson Decl. Ex. M; Compl. ¶ 40.  A month later, however, the relationship completely collapsed, and on July 3, 2012, Jason terminated the relationship, denying Fr. Emmanuel access to Jason's accounts.  Lemelson Decl. Ex. L.  One week later, Jason told Fr. Emmanuel, "Stop emailing me," and "t[ook] over explicit responsibility for the account."  Lemelson Decl. Ex. L; Compl. ¶ 45.

**E.     July 2012 through July 2014: The Lemelson Brothers Each Establish Their Own Hedge Fund**

Shortly after Jason stopped allowing Fr. Emmanuel access to Jason's investment accounts, Fr. Emmanuel established a hedge fund, The Amvona Fund, LP.  Compl. ¶ 1. The general partner and investment manager of The Amvona Fund is Lemelson Capital Management, LLC, of which Fr. Emmanuel is the Chief Investment Officer.  *Id.* Lemelson Capital Management registered with the Massachusetts Securities Division in July 2012.  *Id.*  Fr. Emmanuel, however, did not register as an investment adviser representative.  *See id.*

Approximately two years after The Amvona Fund and Lemelson Capital Management were formed, Jason established his own hedge fund, Spektra Fund, LP.  *Id.* at ¶ 2.  On May 3, 2015, Jason issued a press release regarding Spektra Fund and specifically Jason's performance in 2013 and 2014 (after Jason had terminated the relationship with Fr. Emmanuel).  Compl. ¶ 48.  Fr. Emmanuel argues that that release

---

[4] The Complaint also alleges that Fr. Emmanuel also made trades on Jason's behalf between April 25 and July 3.  Compl. ¶¶ 31-33, 37, 39.

"misrepresented . . . that the returns and success of the investment strategies and management that [Fr. Emmanuel] employed in furtherance of [the Lemelson Brothers'] joint venture or partnership were [Jason's], not [Fr. Emmanuel's]." Compl. ¶ 72.

## II.   Argument

### A.   Standard for Motion to Dismiss for Failure to State a Claim[5]

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007)). But while allegations ordinarily must be accepted as true, the Court "need not credit bald assertions or unsupportable conclusions." *Dodora Unif. Comm'ns, Inc. v. Direct Info. Pvt. Ltd.*, 379 F. Supp. 2d 10, 14 (D. Mass. 2005) (citing *In re Colonial Mortg. Bankers Corp.*, 324 F.3d 12, 15 (1st Cir. 2003)). And the Court is not required to accept allegations that are contradicted by the documentary evidence they purport to reflect or other evidence subject to judicial notice. *Okla. Firefighters Pension & Retirement Sys. v. IXIA*, 50 F. Supp. 3d 1328, 1348 (C.D. Cal. 2014) (quoting *Steckman v. Hart Brewing, Inc.*, 143 F.2d 1293, 1295 (9th Cir. 1998)). Thus, in addition to the allegations, the Court can properly consider "documents the authenticity of which are not disputed by the parties; [] official public records; [] documents central to plaintiff['s] claim; or [] documents sufficiently referred to in the complaint." *Watterson v. Page*, 987 F.2d 1, 3-4 (1st Cir. 1993) (citations omitted).

---

[5] Unless otherwise noted, whether Massachusetts law (the law of the forum state and Fr. Emmanuel's place of residence) or Washington law (the law of Jason's state of residence) applies to the substantive claims in the Complaint will not affect the outcome of this Motion. Jason cites to both Massachusetts and Washington law throughout this motion, with a focus on Massachusetts law. *See Millipore Corp. v. Travelers Indem. Co.*, 115 F.3d 21, 29 (1st Cir. 1997) (explaining that first step in Massachusetts choice of law analysis was whether there was an actual conflict between the substantive law of the interested jurisdictions). Jason reserves the right to argue that Washington law applies in the future.

In support of this motion to dismiss, Jason has submitted two types of exhibits for consideration by the Court: (1) analysis by Fr. Emmanuel that was publicly available at the relevant times because Fr. Emmanuel published it on the amvona.com website;[6] and (2) emails between the Lemelson Brothers that are incorporated by reference in the Complaint.[7]  Both categories are properly before the Court on this motion to dismiss.  *Id.* at 3-4.

The exhibits in the first category of documents are properly before the Court because they are subject to judicial notice.  Fr. Emmanuel cannot reasonably dispute the authenticity of the webpages (which are referenced in the Complaint, *see* Compl. ¶¶ 6-7) since they are on a website that he controls.  *Finn v. Barney*, 471 Fed. App'x 30, 32 (2d Cir. 2012) (district court did not abuse discretion by taking judicial notice of section of defendant's website where purpose of judicial notice was to establish that the information was publicly available); *Blay v. Zipcar*, 716 F. Supp. 2d 115, 118 (D. Mass. 2012) (considering defendant's website which was referenced in complaint, noting that doing so did not even "present[] a potentially close question"); *Perkins v. LinkedIn Corp.*, 53 F. Supp. 3d 1190, 1204 (N.D. Cal. 2014) ("Proper subjects of judicial notice when ruling on a motion to dismiss include . . . publically [sic] accessible websites.") (citations omitted).

As for the second category, all of the emails are incorporated by reference in the Complaint.  The Complaint contains quotations from the majority of the emails Jason submits in support of this motion to dismiss and explicitly references all but one of the others; those emails are indisputably incorporated by reference into the Complaint.  *Blay*, 716 F. Supp. 2d at 118 (considering email from plaintiff ending his Zipcar membership in deciding motion to dismiss noting that the email was "central to the claims"); *Schulties v.*

---

[6] Garcia Decl. Exs. 1-5.  Most or all of  Fr. Emmanuel's articles were also published on other websites such as seekingalpha.com.
[7] Lemelson Decl. Exs. A-M.

*Nat'l Passenger R.R. Corp.*, 650 F. Supp. 2d 994 (N.D. Cal. 2009) (considering email sent by plaintiff and forwarded to defendants); *Nat'l Distillers & Chem. Corp. v. Dep't*, 1980 WL 1057, at *2 n.1 (D. Del. Oct. 23, 1980) (document that was repeatedly referenced in complaint, that formed the basis for many of the allegations in the complaint, and which the parties conceded was authentic was properly before court on motion to dismiss); *Dehaan v. Brandeis Univ.*, 150 F. Supp. 626 (D. Mass. 1957) (considering letter from defendant to plaintiff that plaintiff did not submit as exhibit to complaint).   As for the one email that Fr. Emmanuel does not quote or clearly reference in the Complaint, it is part of the correspondence regarding both the payment of a performance fee and the establishment of a hedge fund and thus is admissible as part of the context surrounding the explicitly referenced documents.   *E.g.*, *Knievel v. ESPN*, 393 F.3d 1068, 1076-77 (9th Cir. 2005) (considering webpages that "surround[ed]" those that were attached to complaint under "incorporation by reference" doctrine); *Perkins*, 53 F. Supp. 3d at 1205 (considering screen shot of webpage that appeared between two pages cited in the complaint).

**B.**      **Counts I Through III Should Be Dismissed for Failure to State a Claim.**

   1.      Massachusetts State Law Bars Fr. Emmanuel From Accepting
           Compensation for Investment Advice and/or Management.[8]

   Fr. Emmanuel's first three causes of action fail because he was not registered as an investment adviser or investment adviser representative during the relevant time period and therefore could not receive compensation for  "advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities."   M.G.L. ch. 110A, § 201(c) ("It is

---

[8] Several federal laws also bar Fr. Emmanuel from accepting a performance-fee based on an alleged oral agreement, but Jason does not address those in this motion because Fr. Emmanuel's claims are clearly barred under state law.

unlawful for any person to transact business in [Massachusetts] as an investment adviser or as an investment adviser representation unless he is so registered under this chapter."); *id.* § 401(m-n) (defining the conduct that makes someone an investment adviser or investment adviser representative). The statute also requires that investment advisers (who by definition must be registered) provide material information in writing to their clients—including the "compensation arrangements" between the two and the estimated amount of any commission that will be charged. M.G.L. ch. 110A, § 203A(a)(1), (b)(1). The statute further provides that "[n]o person who has made or engaged in the performance of any contract in violation of any provision of this chapter or any rule or order hereunder . . . may base any suit on the contract." M.G.L. ch. 110A, § 410(f).[9]

It is indisputable that the Complaint alleges and seeks compensation for conduct that would qualify Fr. Emmanuel as an "investment adviser representative," including recommending that Jason purchase specific securities and purchasing and selling securities on Jason's behalf. *See, e.g.*, Compl. ¶¶ 9, 11-12, 14, 18, 20, 25, 28, 30-33, 37, 39, 41. The Complaint is also clear that Fr. Emmanuel was not registered during the applicable time period. Compl. ¶ 1 (providing only that Fr. Emmanuel is the Chief Investment Officer of Lemelson Capital Management, LLC, which was formed in June 2012 and registered in July 2012). As such, he is barred from accepting compensation for his services. *Crown v. Kobrick Offshore Fund, Ltd.*, 85 Mass. App. Ct. 214, 228 (2014) (affirming summary dismissal of counterclaim for breach of contract, explaining that M.G.L. ch. 110A, § 410(f) "would ultimately bar the defendants from recovering"); *cf. Indus Partners, LLC v. Intelligroup, Inc.*, 77 Mass. App. Ct. 793, 794 (2010) (affirming summary dismissal of breach of contract and quantum meruit claims because

---

[9] This provision is a codification of the common law principle that illegal contracts are not enforceable.

contract called for plaintiff to act as a broker-dealer where plaintiff was not registered); *Novelos Therapeutics, Inc. v. Kenmare Capital Partners, Ltd.*, 2001 WL 893449, at *8 (Mass. Super. June 29, 2001) (unpublished) (holding that unregistered broker-dealer was statutorily barred from receiving compensation under a contract that called on defendant to act as a broker-dealer).  This is true regardless of whether the cause of action is based on a contract or quasi-contract theory.  *See, e.g.*, *Indus Partners, LLC,* 77 Mass. App. Ct. at 794; *cf. Thywissen v. FTI Corp.*, 518 S.W.2d 947 (Tex. App. 1975) ("In view of our holding that FTI is precluded from maintaining an action on the basis of its alleged contractual agreement with Thywissen [based on a statutory provision similar to M.G.L. ch. 110A, § 410(f)], we further hold that it is precluded from recovery on the theory of quantum meruit.") (citation omitted).  The bar also extends to Fr. Emmanuel's claim for breach of the covenant of good faith and fair dealing because that claim is "base[d] . . . on the contract."  M.G.L. ch. 110A, § 410(f).

    2.    <u>Fr. Emmanuel Has Failed to State a Claim for Breach of Contract.</u>

To state a claim for breach of contract, Fr. Emmanuel must allege "offer, acceptance, and an exchange of consideration or meeting of minds."  *Aragao v. Morg. Elec. Reg. Sys., Inc.*, 22 F. Supp. 3d 133, 139 (D. Mass. 2014) (quoting *Northrup v. Brigham*, 63 Mass. App. Ct. 362, 367 (2005)).  Fr. Emmanuel's claims fail because although he arguably alleges two offers for a 50% performance fee—one by Fr. Emmanuel[10] and one (presumably) by Jason[11]—Fr. Emmanuel does not allege that the first offer was accepted and, as to the second, the documentary evidence (which is properly before the Court because Fr. Emmanuel relies on it) establishes that Fr.

---

[10] Compl. ¶ 9.
[11] Compl. ¶ 26.

Emmanuel refused to accept *any* compensation, and thus there was no meeting of the minds.

Fr. Emmanuel first alleges that in October 2011, he "stated clearly with the recommendation [to purchase $3,000,000 worth of shares of FRPT] that he expected a fifty percent (50%) performance fee on the realized profits." Compl. ¶ 9. He does not allege, however, that Jason agreed to pay him that fee. Nor does he even allege that Jason followed his recommendation—in fact, the Complaint suggests that while Jason purchased shares of FRPT, he only purchased approximately $107,000 worth,[12] which is less than 5% of what Fr. Emmanuel had recommended. Thus, because Jason never agreed to this alleged statement, no contract was formed at that time.[13]

Fr. Emmanuel next alleges that on an unspecified date after March 20, 2012, the Lemelson Brothers "orally agreed that Jason would compensate Fr. [Emmanuel] with a performance fee of fifty percent (50%) of any gains from Fr. [Emmanuel's] investments and management of Jason's portfolio." Compl. ¶ 26. But this allegation—as well as any assertion that Fr. Emmanuel ever asked for and expected compensation—is directly contradicted by an April 1, 2012 email in which Fr. Emmanuel acknowledges his brother's desire to pay a performance fee but states "of course [I] have declined" that offer. Lemelson Decl. Ex. H. The next day, Jason said to his brother that he "thought the strategy was clear.........you allocate the capital and I'd transfer [some yet-to-be agreed upon] performance compensation *against your will*:)." Lemelson Decl. Ex. I; Compl. ¶

---

[12] Jason purchased 28,000 shares at a price of approximately $3.81 per share. *See* Compl. ¶ 9; Lemelson Decl. Ex. F.

[13] Moreover, even if there had been a meeting of the minds as to the *amount* of compensation, other crucial details are missing from the allegations surrounding the October 2011 purchase of FRPT. For example, it is unclear whether the parties' alleged agreement would apply only to trades of FRPT or also other securities recommended by Fr. Emmanuel or whether it applied to trades before or after October 5.

30.  Because these emails directly contradict the allegations in the Complaint, the
allegations should not be credited as true.[14]

        3.      <u>Fr. Emmanuel Has Failed to State A Claim For Breach of the Covenant of
Good Faith and Fair Dealing.</u>

       To state a claim for breach of the covenant of good faith and fair dealing, the
plaintiff must allege a valid and enforceable contract, *Von Papen v. Rubman*, 18 F. Supp.
3d 77, 87 (D. Mass. 2014) (citations omitted), and that the defendant engaged in some
conduct, other than merely breaching the contract, that deprives the plaintiff of the full
benefit of performance, *Christensen v. Kingston Sch. Comm.*, 360 F. Supp. 2d 212, 226-
27 (D. Mass. 2005) (dismissing breach of covenant claim where there was no allegation
of improper motive or "pretextual or coercive" behavior) (citing *Anthony's Pier Four,
Inc. v. HBC Assocs.*, 411 Mass. 451, 471 (1991)); *accord Badgett v. Sec. State Bank*, 807
P.2d 356, 360 (Wash. 1991) (holding that bank did not have an obligation to
affirmatively cooperate with farmer to restructure loan).

       Fr. Emmanuel has not stated a claim for breach of contract because he has not
alleged that the Lemelson Brothers ever formed a contract.  *See* Section II.B.1. *supra*.
Moreover, even if the Lemelson Brothers had formed a contract, Fr. Emmanuel alleges
nothing more than that Jason failed to pay the amount due under the alleged contract.  In
other words, his claim for breach of the covenant of good faith and fair dealing is
identical to his claim for breach of contract.  As such, Fr. Emmanuel can only recover (if
at all) for breach of contract; he is not entitled to separate recovery for breach of the
covenant of good faith and fair dealing.  *Christensen*, 360 F. Supp. 2d at 229 (explaining

---

[14] Of course, even if Fr. Emmanuel's allegations were sufficient for purposes of contract
formation in March 2012, that would not establish a contract (or Fr. Emmanuel's
entitlement to a performance fee) related to work that was performed before the date of
the purported oral agreement.

that redress for failure to perform under a contract should be sought by means of a breach of contract action and  "[n]o claim for breaching an implied covenant of good faith and fair dealing need be pled unless the factual circumstances actually warrant the additional claim").  Accordingly, regardless of whether the Complaint sufficiently alleges that the Lemelson Brothers formed a valid, enforceable contract, Count II should be dismissed.

       4.      <u>Fr. Emmanuel Has Failed to State a Claim for Quantum Meruit/Unjust Enrichment.</u>

To state a claim for quantum meruit/unjust enrichment, a plaintiff must allege that "(1) he conferred a measurable benefit upon the defendant; (2) a reasonable person in defendant's position would have expected to compensate the plaintiff upon accepting his services; and (3) the plaintiff provided the services, with the reasonable expectation of receiving compensation." *Wendt v. Barnum*, 2007 WL 1783870, at *3 (Mass. App. Div. Jun. 18, 2007).[15]  Fr. Emmanuel's claim fails for two reasons: (1) Fr. Emmanuel did not reasonably expect payment; and (2) no reasonable person in Jason's position would have expected to pay Fr. Emmanuel a 50% performance fee.

       *a.*     *Fr. Emmanuel did not have a "reasonable expectation of receiving compensation" because he refused compensation.*

Fr. Emmanuel could not have been more clear with Jason: he did not want to be compensated for his purported services.  At most, he simply wanted Jason to make a donation to Fr. Emmanuel's church—specifically, a $10,000 donation, which represented

---

[15] To the extent that there is a difference between Washington and Massachusetts law, it is that Washington distinguishes between quantum meruit and unjust enrichment based on whether the recovery sought is for the value of services performed or the value of good or services retained.  In other words, quantum meruit measures damages from the plaintiff's perspective and unjust enrichment measures damages from the defendant's perspective.  That said, the two causes of action are essentially the same since all quantum meruit actions could have been brought as unjust enrichment actions even though some unjust enrichment actions would not be actionable under the quantum meruit theory.  *Baile Commc'ns, Ltd. v. Trend Bus. Sys., Inc.*, 810 P.2d 12, 18 (Wash. 1991).

a fraction of what Fr. Emmanuel is now claiming.  Lemelson Decl. Ex. H.  Moreover, the

correspondence indicates that Fr. Emmanuel voluntarily and gratuitously provided these

purported services to his brother because it was a "joy [] being part of peoples [sic]

learning and development."  *Id.* Ex. F.  In other words, he volunteered his time and

expertise, and as such, could have no reasonable expectation of compensation.  *U.S. Fid.*

*& Guar. Co. v. N.J. B. Prime Investors*, 6 Mass. App. Ct. 455, 461 (1978).

>           b.       *No reasonable person in Jason's position would have expected to*
>                    *pay a 50% performance fee to someone who had refused multiple*
>                    *offers of an indeterminate amount of compensation.*

Because Fr. Emmanuel refused Jason's offer to pay him an indeterminate sum of

money, no reasonable person in Jason's position would have expected to compensate Fr.

Emmanuel.  Moreover, even if it would have been reasonable for Jason to believe that Fr.

Emmanuel expected compensation, it would not have been reasonable to believe that he

expected to be paid 50% of Jason's return on investment.  As demonstrated above, the

Lemelson Brothers never agreed that compensation would be in that amount, and there is

no basis in the Complaint or the underlying email correspondence to believe that a

reasonable person would have believed that that was the amount due.  Thus, Fr.

Emmanuel has failed to state a cause of action for unjust enrichment, and Count III

should be dismissed.

**C.       Count IV Should Be Dismissed For Failure to State a Claim.**

Fr. Emmanuel alleges that the Lemelson Brothers "agreed to carry on a joint

venture or partnership for purposes of forming a hedge fund," Compl. ¶ 70, and that, as

such, Jason owed Fr. Emmanuel a duty of good faith and a duty of loyalty, *id.* ¶ 71.  Fr.

Emmanuel further alleges that Jason breached those duties by a) "unilaterally aborting

their efforts to form a hedge fund [and] usurping for himself the resources and

opportunity of the parties' joint contributions, efforts, and capital," *id.* ¶ 71; b) misrepresenting that "the returns and success of the investment strategies and management . . . were his," not Fr. Emmanuel's, *id.* ¶ 72; and c) failing to pay a performance fee for Father Emmanuel's management of Jason's investments, *id.* ¶ 76. Fr. Emmanuel's claim for breach of fiduciary duty must be dismissed because Jason never owed fiduciary duties to Fr. Emmanuel not to engage in the activities alleged. *See Hanover Ins. Co. v. Sutton*, 46 Mass. App. Ct. 153, 164 (1999) (identifying four essential elements of claim for breach of fiduciary duty: existence of duty, breach, causation, and damages).

      1.    <u>The Complaint Does Not Plausibly Allege a Partnership.</u>[16]

The Complaint does not adequately allege a partnership, and in the absence of such a relationship, the Lemelson Brothers did not owe one another the fiduciary duties of good faith and loyalty. A partnership does not arise until "the parties intend to associate themselves" as partners. *Kravitz v. Pressman, Frohlich & Frost, Inc.*, 447 F. Supp. 203, 210 (D. Mass. 1978); *Cardullo v. Landau*, 329 Mass. 5, 8 (1952); *see also Pray v. SMPO Properties, Inc*., 746 F. Supp. 2d 317, 322 (D. Mass. 2010) ("In Massachusetts, the formation of a joint venture depends on the parties' manifest intent."). A manifestation of intent requires the parties to "1) agree on all of the material terms, 2) have the present intention to be bound by that agreement and 3) support the agreement with sufficient consideration." *Pray*, 746 F. Supp. 2d at 322 (finding genuine issue of fact with respect to existence of joint venture where it was not clear that parties had

---

[16] As it relates to this motion, the same analysis applies whether the arrangement is classified as a partnership or a joint venture. For simplicity, this motion refers to it as a putative partnership. *See, e.g.*, *BPR Group Ltd. P'ship v. Bendetson*, 453 Mass. 85, 861, 906 N.E.2d 956 (2009) ("Although this case involves joint ventures, the Uniform Partnership Act (UPA), codified at G.L. c. 108A, §§ 1 et seq., is generally applicable to joint ventures by analogy, though it does not govern directly.") (internal quotations and citations omitted).

agreed on material terms); *see also Perry v. Stanton*, 2005 WL 3739900, at *14 (Mass. Sup. Ct. Dec. 28, 2005) (unpublished) ("Here, the evidence is that there was an intention to form a partnership…However, that intention was to form a partnership in the future once certain issues had been resolved."). Count IV fails because there was neither agreement on all material terms nor a present intention to be bound.

Setting aside the conclusory allegations in paragraph 70 of the Complaint, the Complaint and the incorporated documents indicate that, at best, the Lemelson Brothers began discussing and negotiating possible terms for a partnership. Fr. Emmanuel does not allege that the parties reached the requisite agreement on material terms. *See, e.g.*, Compl. ¶ 29 (alleging that the parties merely "<u>discussed</u> costs, operations, potential names, development and overall strategies for the hedge fund") (emphasis added). Rather, Fr. Emmanuel alleges that Jason terminated the purported partnership before the hedge fund was formed—but until the hedge fund was formed, there could be no partnership or fiduciary duties. *See Petricca Dev. Ltd. P'ship v. Pioneer Dev. Co.*, 40 F. Supp. 2d 49, 55 (D. Mass. 1999), *aff'd*, 214 F.3d 216 (1st Cir. 2000) (finding no joint venture, and consequently, no fiduciary duties, where condition precedent to the parties' formation of a joint venture had not been fulfilled).

2.   <u>Even If a Partnership Had Been Formed, Jason Did Not Breach Any Fiduciary Duty By Dissolving the Partnership or Making the Alleged Misrepresentations.</u>

Assuming, *arguendo*, that the parties formed a valid partnership, Jason cannot be held liable for dissolving the partnership or making the alleged misrepresentations. First, Jason had an absolute right to dissolve the partnership at any time. M.G.L. ch. 108A, § 31(1)(b) ("Dissolution is caused . . . by the express will of any partner when no definite term or particular undertaking is specified . . . ."); *see also Miami Subs Corp. v. Murray*

*Family Trust*, 703 A.2d 1366, 1371 (N.H. 1997) (holding that "joint venture to develop, finance, and operate" restaurants could be terminated at any time because "development and operation . . . could conceivably have continued indefinitely"). Second, the alleged misrepresentations were made in March 2015—almost three years after the alleged partnership was terminated. *See* Compl. ¶¶ 72-75. At that time, Jason did not owe Fr. Emmanuel any fiduciary duties because they were no longer partners. *DeCotis v. D'Antona*, 350 Mass. 165, 168 (1966) (duties of good faith and loyalty arising from a partnership did not survive termination of that relationship). Therefore, Fr. Emmanuel's breach of fiduciary duty claim fails because the allegations demonstrate that Jason did not owe Fr. Emmanuel any fiduciary duties.

> 3. <u>No fiduciary relationship existed that would require Jason—a client—to pay Fr. Emmanuel—who acted as his (unregistered) investment adviser— a performance fee.</u>

Finally, to the extent Fr. Emmanuel is arguing that Jason had a fiduciary duty to pay Fr. Emmanuel for "brilliantly managing Jason's investment," no such duty was ever owed because Jason was Fr. Emmanuel's "client," not his fiduciary. Moreover, as explained in Section II.B.4. *supra*, paying Fr. Emmanuel would be unlawful because he was not registered as an investment adviser at the relevant time. Thus, Jason did not breach any fiduciary duty by failing to pay Fr. Emmanuel for his investment advice.

## III.   Conclusion

Defendant Jason Lemelson respectfully requests that the Court grant this motion to dismiss and dismiss all four causes of action with prejudice for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). Counts I through III fail to state a claim because (1) Fr. Emmanuel was statutorily barred from receiving any compensation because he was not registered as an investment adviser representative during the relevant

time period; (2) there was no agreement or mutual assent to the performance fee and thus no contract was formed; and (3) based on Fr. Emmanuel's statements, Fr. Lemelson could not have reasonably expected compensation and Jason should not have reasonably expected to pay Fr. Emmanuel a 50% performance fee.  As for Count IV, the allegations do not plausibly state a claim because they are insufficient to support a finding that the Lemelson Brothers had entered into a partnership, and even if they had, the fiduciary duties that Fr. Emmanuel alleges are not recognized in Massachusetts.  Finally, as demonstrated by the documents submitted in support of this motion, all of which are incorporated by reference in the Complaint and/or subject to judicial notice, amendment would be futile and therefore the dismissal should be with prejudice.

DATED this 14th day of July, 2015.

Respectfully submitted,

JASON D. LEMELSON

By his attorneys:


s/ Philip M. Guess
Philip M. Guess (admitted pro hac vice)
philip.guess@klgates.com
Heidi Craig Garcia (admitted pro hac vice)
heidi.garcia@klgates.com
Lindsay S. Bishop (BBO# 670251)
lindsay.bishop@klgates.com
K&L Gates LLP
State Street Financial Center
One Lincoln Street
Boston, MA 02111-2950
Tel.:  (617) 261-3100
Fax: (617) 261-3175

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on this 14th day of July 2015.

Douglas F. MacLean
BBO No. 646750
dmaclean@armorlawgroup.com
ARMOR LAW GROUP
22 Batterymarch Street
Boston, MA 02109
T: 617-350-5250

Brian R. Birke
BBO No. 652720
bbirke@apslaw.com
Rory Z. Fazendeiro
BBO No. 648334
rfazendeiro@apslaw.com
ADLER POLLOCK & SHEEHAN P.C.
175 Federal Street
Boston, MA 02110
T: 617 482 0600

s/ Philip M. Guess