UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| REV. FR. EMMANUAL LEMELSON a/k/a GREGORY M. LEMELSON<br><br>Plaintiff,<br><br>v.<br><br>JASON D. LEMELSON<br><br>Defendant. | CIVIL ACTION<br><br>NO. 4:15-CV-40082-TSH |

**ORDER AND MEMORANDUM OF DECISION ON
DEFENDANT'S MOTION TO DISMISS (Docket No. 14)**

**October 1, 2015**

**HILLMAN, D.J.**

Pending before this Court is Defendant's motion to dismiss Plaintiff's complaint for failure to state a claim upon which relief can be granted. For the reasons set forth below, Defendant's motion is ***granted***.

**Background**

The following facts are taken from the First Amended Complaint and Jury Demand (the complaint) filed by Plaintiff, Rev. Fr. Emmanuel Lemelson a/k/a/ Gregory M. Lemelson (Gregory), as well as from the exhibits submitted by Defendant, Jason D. Lemelson (Jason), alongside his motion to dismiss.[1] Gregory is a Greek Orthodox priest who resides in Southborough, Massachusetts. Gregory is also an internationally recognized, top-performing

---

[1] Because the two parties in this case share a surname, I shall refer to them by their given names for the sake of clarity. I intend no disrespect.

hedge fund manager. He is the Chief Investment Officer of Lemelson Capital Management, LLC, a Massachusetts LLC formed in June of 2012, which in turn is the general partner and investment manager of The Amvona Fund, LP, a long-biased U.S. equity fund formed in July of 2012. Jason is Gregory's brother. Jason lives in Bellevue, Washington and is the Managing Director of Spektra Capital, LLC, a Washington LLC formed in June of 2014. Spektra Capital, LLC is the general partner and investment manager of the Spektra Fund, LP, which was formed in July of 2014.

In August of 2011, Jason began soliciting Gregory's advice regarding the management of Jason's personal investment portfolio. In October of 2011, Jason travelled to Massachusetts to visit Gregory, and during the visit they continued to discuss Gregory's management of Jason's portfolio. Based on Gregory's advice, Jason acquired 28,000 shares of Force Protection, Inc. (FRPT). Four weeks later, per Gregory's prediction, Force Protection, Inc. was acquired by General Dynamics Corp. and the share price rose dramatically. Gregory then told Jason to sell the stock, which he did, realizing a gain of approximately $47,880. Gregory "stated clearly with the recommendation that he expected a fifty percent (50%) performance fee on the realized profits." (Docket No. 7 at ¶ 9.)

In November of 2011, also on Gregory's instruction, Jason sold his positions in gold and silver. This sale freed up capital to purchase 15,000 shares of Sketchers USA, Inc. (SKX). Jason purchased an additional 7,500 shares of SKX on Gregory's instruction shortly thereafter. Also in November of 2011, Gregory told Jason that he should invest in Western Digital Corp. (WDC); specifically he told Jason to purchase $200,000 worth of the stock and advised him to hold it until Gregory instructed otherwise. Jason capitulated by purchasing 8,500 shares. During November and December of 2011, Jason communicated to Gregory that he was not presently interested in

managing his own investments. In December 2011, Jason transferred $950,000 into an equity portfolio for Gregory's management.

Also in December of 2011, on Gregory's instruction, Jason purchased 20,000 shares of Corning, Inc. (GLW) and 15,750 shares of American Greetings Corp. (AM). By January of 2012, after just a few months of Gregory's management, Jason's portfolio had made a gain of approximately $190,000. Beginning in January of 2012, however, Gregory claims that Jason began misrepresenting to third parties that he (Jason) was the source of the gains in his portfolio, and Gregory indicated to Jason that he expected to receive credit for his own work.

By March of 2012, Jason had realized approximately $320,000 in equity gains as a result of Gregory's management of his portfolio. Following these gains, Jason asked Gregory in an email if he would accept compensation: "[w]ill you accept performance based compensation for managing the capital? I've paid other hedge funds in the past and don't see why your vastly superior performance should go uncompensated." (Docket No. 7 at ¶ 26.) Soon after, "Jason and [Gregory] orally agreed that Jason would compensate [Gregory] with a performance fee of fifty percent (50%) of any gains from [Gregory's] investments and management of Jason's portfolio." (Docket No. 7 at ¶ 26.) Gregory mentioned in an email dated April 2, 2012, however, that Jason had indicated a strong desire to pay a "management / performance fee," which Gregory "of course" had "declined," and Gregory offered Jason to donate $10,000 to a certain church instead. (Docket No. 16-8 at 2.) Gregory noted in this email that $10,000 would have been approximately the amount that Jason would have paid a standard hedge fund in commission for the recent sale of FRPT stock.

In March of 2012, Gregory invited Jason to join him in the formation of a new hedge fund. They discussed costs, operations, potential names, development, and overall strategies for the

hedge fund. Gregory was to serve as the fund's investment manager and Jason was to be responsible for client services and fundraising. Gregory indicated that the commissions paid from the hedge fund's management firm should be divided in half.

In continuing to manage Jason's personal portfolio, Gregory instructed Jason to acquire shares of National Presto Industries, Inc. (NPK); Jason purchased approximately 4,215 shares. In his capacity of having direct access to and control over Jason's brokerage account, in April of 2012 Gregory sold 20,000 shares of GLW for a realized gain of $30,600, as well as 22,500 shares of SKX for a realized gain of $40,275. Gregory also sold Jason's 15,750 shares of AM for a realized gain of $38,764 as well as his shares of NPK for a realized gain of $1,517. Also in April of 2012, Gregory acquired $2,000,000 of WDC; he compensated Jason $500,000 and moved the commensurate amount of stock into his own portfolio, leaving Jason's portfolio with 39,348 shares of WDC. As of May 10, 2012, the brokerage account managed by Gregory had made gains of approximately $430,000.

In early May of 2012, Jason and Gregory began to disagree over the cost basis of certain lots of the AM stock that Jason had transferred from his brokerage account into Gregory's brokerage account. During this time, Gregory also acquired for Jason's brokerage account 8,489 shares of Research In Motion LTD (RIMM), which were later sold for a profit of approximately $20,000.

Although the relationship between Gregory and Jason had now become strained, Gregory claims that Jason had indicated in an email to him that Jason "made clear from the beginning [Jason's] intent has always been to offer [Gregory] performance fees for the extraordinary returns generated." (Docket No. 7 at ¶ 38.) On May 15, 2012, Jason wrote in an email to Gregory: "[p]lease calculate what I owe you in performance fees." (Docket No. 7 at ¶ 38.) Gregory

4

continued to manage Jason's brokerage account through June 1, 2012 and acquired for Jason an additional 92,450 shares of WDC stock.

On June 1, 2012, Jason emailed Gregory to inform him that he had initiated a transfer of all assets to a new brokerage account with a lower margin rate; Jason requested Gregory's login credentials so he could link this account with Gregory's, which would give Gregory access. Gregory and Jason disagreed about who had been responsible for negotiating the lower margin rate. Gregory also informed Jason that it would not be practical to link the two accounts.

On June 15, 2012, Gregory advised Jason to acquire an additional $500,000 worth of WDC stock. He told Jason that he had tried to make the trade himself but had been unable to effect the order. Gregory asked for clarity as to who was managing Jason's brokerage accounts. Jason did not initially respond but later informed Gregory that he had acquired the shares of WDC at the price point based on Gregory's instructions. Gregory again questioned Jason about responsibility for the management of his brokerage account on July 3, 2012. On July 10, 2012, Jason responded by email, telling Gregory, "I do not feel a personal or professional relationship is possible presently." (Docket No. 16-12 at 5.) Later that day, Jason wrote to Gregory:

> I will take over explicit responsibility for the account and managing the capital. I am also aware of the potential for diminished returns and other adverse impacts from this decision.
>
> While there are, undoubtedly financial implications to interrupting "someone else's work" I believe there are far greater implications if the pattern that has emerged is allowed to continue. My emotional and spiritual health is more important to me than maximizing returns.
>
> My confidence in your ability to magnify the capital remains unchanged and is not the basis of this decision.

(Docket No. 16-12 at 3.)  In addition to taking control of his own investment accounts, Jason stopped participating in the joint venture to form a hedge fund.  He also did not pay Gregory any performance fees.

Approximately one year later, Jason sold his WDC stock for the appropriate price as previously analyzed by Gregory, for an estimated realized gain of $4,200,000 to $6,200,000.  In a press release issued in March of 2015 for the promotion of Jason's new hedge fund, Spektra Fund, LP, Jason touted the gains realized from the investment in WDC stock as being the result of Jason's own management strategy.  Further, this press release described Spektra Fund, LP's objectives, targets, and investment strategies in a manner nearly identical to the language used by Gregory to describe his own hedge fund, The Amvona Fund, LP.  These were also the same objectives and investment strategies that Gregory had employed in managing Jason's portfolio.

Gregory alleges that the 50% performance fees charged to Jason's portfolio would have amounted to $118,407 for the non-WDC stock, and between $2,100,000 and $3,100,000 for the WDC stock.  Gregory also asserts that this money would have benefited from the 71.89% rate of return that Gregory has achieved on behalf of The Amvona Fund, LP; thus, as of May of 2015, Gregory claims to have suffered damages in the amount of $597,962 for the non-WDC stock and between $7,000,000 and $10,500,000 for the WDC stock.

Gregory initiated this lawsuit in June of 2015.  He asserts four counts against Jason.  First, Gregory alleges breach of contract, asserting that he and Jason formed a contract for the payment of a 50% performance fee, and that Jason breached this contract by failing to pay the fee.  Second, Gregory alleges breach of the covenant of good faith and fair dealing, effectuated by Jason's failure to pay Gregory's performance fee.  Third, Gregory alleges quantum meruit / unjust enrichment, asserting that Gregory conferred substantial benefits on Jason by managing Jason's portfolio and

producing extraordinary investment gains, and that Gregory conferred these benefits with the reasonable expectation of receiving compensation.

Fourth, Gregory alleges breach of fiduciary duty, asserting that he and Jason became joint venturers or partners with regard to their prospective joint hedge fund.  Gregory asserts that Jason breached his fiduciary duty by unilaterally aborting their efforts to form and operate the hedge fund and by usurping the resources and opportunity of the parties' joint contributions, efforts, and capital in order to form his own fund, Spektra Fund, LP.  Gregory further asserts that, as an investment advisor representative of Spektra Fund, LP, Jason has promoted and misrepresented that the returns and success of the investment strategies and management that Gregory employed in furtherance of the joint venture were his rather than Gregory's.  Gregory also seeks injunctive relief enjoining Jason from making false and/or misleading representations concerning the successful results and strategies that were not the result of Jason's efforts, skill, or management.  Jason has now moved to dismiss Gregory's complaint for failure to state a claim upon which relief can be granted, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## **Discussion**

### *Standard of Review*

To survive a Rule 12(b)(6) motion to dismiss, a complaint must allege "a plausible entitlement to relief."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559 (2007).  Although detailed factual allegations are not necessary to survive a motion to dismiss, the standard "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555.  "The relevant inquiry focuses on the reasonableness of the inference of liability that the plaintiff is asking the court to draw from the facts alleged in the complaint." *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 13 (1st Cir. 2011).

It is a "context-specific task" to determine "whether a complaint states a plausible claim for relief," one that "requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (internal citations omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Id.* (quoting Fed. R. Civ. P. 8(a)(2)). On the other hand, a court may not disregard properly pled factual allegations, "even if it strikes a savvy judge that actual proof of those facts is improbable." *Twombly*, 550 U.S. at 556

In evaluating a motion to dismiss, the court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Langadinos v. American Airlines, Inc.*, 199 F.3d 68, 68 (1st Cir. 2000). In addition to the complaint, the court may consider "documents the authenticity of which are not disputed by the parties; . . . documents central to plaintiffs' claim; [and] documents sufficiently referred to in the complaint." *Curran v. Cousins*, 509 F.3d 36, 44 (1st Cir. 2007) (quoting *Watterson v. Page,* 987 F.2d 1, 3 (1st Cir. 1993)). "This is true even when the documents are incorporated into the movant's pleadings." *Id.*; *see Beddall v. State Street Bank and Trust Co.,* 137 F.3d 12, 17 (1st Cir. 1998) ("When . . . a complaint's factual allegations are expressly linked to—and admittedly dependent upon—a document [offered by the movant] (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it . . . .").

### *Gregory's Status as an Investment Advisor*

Jason argues that the first three counts of Gregory's complaint should be dismissed because Gregory was not registered as an investment advisor during the time when he was managing Jason's portfolio. Jason cites the Massachusetts Uniform Securities Act, Mass. Gen. Laws ch.

110A, §§ 101-417 (Massachusetts Act), which regulates—among other things—the registration requirements of investment advisors. Section 401(m) of the Massachusetts Act defines "investment advisor" as "any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to value of securities or as to the advisability of investing in, purchasing, or selling securities . . . ." Investment advisors are required to register with the Commonwealth. Mass. Gen. Laws ch. 110A, § 201(c) ("It is unlawful for any person to transact business in this commonwealth as an investment adviser or as an investment adviser representative unless he is so registered under this chapter."

Section 410(f) of the Massachusetts Act further provides: "No person who has made or engaged in the performance of any contract in violation of any provision of this chapter or any rule or order hereunder, or who has acquired any purported right under any such contract with knowledge of the facts by reason of which its making or performance was in violation, may base any suit on the contract." *See Crown v. Kobrick Offshore Fund, Ltd.*, 8 N.E.3d 281, 292 (Mass. App. Ct. 2014) *review denied*, 20 N.E.3d 610 (Mass. 2014). This prohibition also applies to claims for quantum meruit. *Indus Partners, LLC v. Intelligroup, Inc.*, 934 N.E.2d 264, 265-66 (Mass. App. Ct. 2010). Thus, if Gregory was acting as an un-registered investment advisor during his management of Jason's portfolio, he is barred from asserting claims against Jason for breach of contract or quantum meruit / unjust enrichment stemming from these services.

In response, Gregory makes two principal arguments. First, he asserts that he was not required to register as an investment advisor while managing Jason's portfolio because he did not meet the definition of that term, as set forth in section 401(m) of the Massachusetts Act (quoted above). Gregory concedes that he provided advice to Jason regarding securities and that he expected compensation for these services. He argues, however, that he was not "engaged in the

business" of doing these activities during the time when he managed Jason's portfolio and that, therefore, he was not acting as an investment advisor.

The Securities and Exchange Commission (SEC) has provided guidance to persons engaged in integrated advisory services, such as financial planners, in order to determine whether one is subject to the registration requirements of an investment advisor. *See Applicability of the Investment Advisers Act to Financial Planners, Pension Consultants, & Other Persons Who Provide Investment Advisory Services As A Component of Other Financial Services,* Release No. 1092 (Oct. 8, 1987) (hereinafter *SEC Guidance Materials*). Although the *SEC Guidance Materials* relate to federal rather than Massachusetts law, the operable definition of "investment advisor" is nearly identical to the provision in section 401(m) of the Massachusetts Act. *See id.* at 3. This advisory document provides the following useful guidance for determining the "in the business" element of the definition of investment advisor:

> Whether a person giving advice about securities for compensation would be "in the business" of doing so, depends upon all relevant facts and circumstances. The staff considers a person to be "in the business" of providing advice if the person: (i) holds himself out as an investment adviser or as one who provides investment advice, (ii) receives any separate or additional compensation that represents a clearly definable charge for providing advice about securities, regardless of whether the compensation is separate from or included within any overall compensation, or receives transaction-based compensation if the client implements the investment advice, or (iii) on anything other than rare, isolated and non-periodic instances, provides specific investment advice. . . . "[S]pecific investment advice" includes a recommendation, analysis or report about specific securities or specific categories of securities . . . ."

*Id.* at 4.

Gregory asserts that he was not "in the business" of providing investment advice while managing Jason's portfolio because, during this time, "he had no letterhead, had no telephone listing and did not let it be known that he would accept any advisory clients." (Docket No. 18 at

9.) Gregory also asserts in the complaint that, "[f]rom 2010 until July 2012, [Gregory] was not engaged in the business of providing investment advice to others and did not publish any written material that consisted of the rendering of advice on the basis of the specific investment situation of any person." (Docket No. 7 at ¶ 6.)

Despite Gregory's contentions, it is clear from the factual allegations set forth in the complaint, as well as from the exhibits submitted alongside Jason's motion to dismiss, that Gregory was acting as an investment advisor, as that term is defined in the Massachusetts Act, when he managed Jason's portfolio. The complaint sets forth in detail that Gregory provided specific advice to Jason regarding the value of certain securities, over a period of months. The basis of this lawsuit rests on Gregory's contention that he performed these services with the expectation of compensation. Regarding the "engages in the business" aspect of the definition of investment advisor set forth in section 401(m), the facts as pled show that he satisfies this requirement as well. Indeed, his actions satisfy all three prongs set forth in the *SEC Guidance Materials*; although, because the language of this test is disjunctive, any one element would be sufficient to constitute "engaging in the business" of investment advising. *See SEC Guidance Materials* at 4; *see also* 19 Reg. Fin. Pl. § 3:5 (referring to the three elements as factors to be considered in the determination of the "in the business" element of the investment advisor definition).

Regarding the first prong of the SEC's "in the business" test, Gregory held himself out as an investment advisor or as one who provided investment advice by publishing articles on his website, "amvona.com."[2] On August 10, 2011, he authored an article on the comparable viabilities

---

[2] Although appended to Jason's filings rather than Gregory's complaint, these articles are properly before me on this motion to dismiss because their existence is central to Gregory's claims and their authenticity has not been challenged. *See Curran*, 509 F.3d at 44.

of Western Digital Corp. stock and Seagate Technologies stock. (Docket No. 17-2 at 2.) On December 2, 2011, he authored another post about the viability of Western Digital stock. (Docket No. 17-5 at 2.) On January 5, 2012, he wrote an article about the past and future viability of American Greetings Corp. stock. (Docket No. 17-4 at 2.) In all of these articles Gregory analyzed and made predictions about the values of certain securities. In my opinion, these publications constitute holding himself out as an investment advisor during late 2011 and early 2012, which was when he was managing Jason's portfolio.[3] Gregory easily satisfies the second prong of the SEC's "in the business" test by alleging in the complaint that he and Jason agreed to a compensation rate of 50%. Prong three is equally well established; if Gregory's complaint establishes anything, it is that he provided Jason with detailed recommendations and analyses regarding specific securities, on a repeated, regular basis, consistently for a period of nearly one year. Thus, looking to the definition of "investment advisor" set forth in section 401(m) of the Massachusetts Act, and considering the applicable *SEC Guidance Materials*, I am convinced that the facts as pled by Gregory show that he was acting as an investment advisor by managing Jason's portfolio.

Next, Gregory brings my attention to an exemption to the investment advisor registration requirement for "private fund advisors." The Massachusetts Code of Regulations defines a

---

[3] To be clear, I am not making a finding as to whether these articles themselves constituted sufficient actions to render Gregory an investment advisor. *See* Mass. Gen. Laws ch. 110A, § 401(m)(1)(D) ("'Investment adviser' shall not include . . . a publisher of any newspaper, news column, newsletter, news magazine, or business or financial publication or service whether communicated in hard copy form, or by electronic means, or otherwise, that does not consist of the rendering of advice on the basis of the specific investment situation of each client"). Rather, these articles show that Gregory was holding himself out as an investment advisor, which is relevant to the determination of whether he was "in the business" of providing investment advice, which in turn is an element of the general definition of "investment advisor" set forth in section 401(m).

"Private Fund Advisor" as "an investment adviser who provides advice solely to one or more private funds." 950 CMR 12.205(2)(c)(1)(b). The regulations further provide a registration exemption for private fund advisors; however, in order to be exempt, the private fund advisor must meet certain qualification requirements, must file an exemption report with the Commonwealth, and must pay a reporting fee. 950 CMR 12.205(2)(c)(2)(a)-(c). As stated in the complaint, Lemelson Capital Management, LLC—of which Gregory is the Chief Investment Officer—filed as an exempt reporting advisor with the Massachusetts Securities Division in July of 2012. This entity, however, was formed after Gregory had stopped managing Jason's portfolio. Nowhere in Gregory's complaint, nor in his memoranda, nor in any of the exhibits, has he alleged that he filed (or was even eligible to file) as an exempt private fund advisor during the time when he was managing Jason's portfolio.

Because the facts and exhibits show that Gregory was acting as an unregistered, un-exempt investment advisor when he managed Jason's portfolio, he is now barred from asserting any contractual or quasi-contractual rights stemming from compensation due to him for these services. *See* Mass. Gen. Laws ch. 110A, § 410(f); *Crown*, 8 N.E.3d at 292; *Indus Partners, LLC*, 934 N.E.2d at 265-66; *see also Uno Restaurants, Inc. v. Boston Kenmore Realty Corp.*, 805 N.E.2d 957, 964 (Mass. 2004) (claim for breach of covenant of good faith and fair dealing cannot be sustained absent enforceable contract). Accordingly, Defendant's motion to dismiss is granted with regard to counts I, II, and III of Plaintiff's complaint.

### *Breach of Fiduciary Duty*

In the fourth count of the complaint, Gregory alleges that Jason owed him a fiduciary duty on account of their relationship as partners or joint venturers in the prospective formation of their new hedge fund beginning in March of 2012. Gregory alleges that Jason breached this duty by

unilaterally terminating their efforts to form the fund in July of 2012, and by later falsely misrepresenting that Jason had been responsible for the gains in his portfolio realized during Gregory's management. Jason argues that this claim should be dismissed because he and Gregory never formed a partnership and, even if they did, Jason did not breach any fiduciary duties relating to this partnership.

Under Massachusetts law, "[a] partnership is an association of two or more persons to carry on as co-owners a business for profit . . . ." Mass. Gen. Laws ch. 108A, § 6(1). Courts use several factors to determine whether a partnership exists, including: "whether there is '(1) an agreement by the parties manifesting their intention to associate in a partnership[,] (2) a sharing by the parties of profits and losses, and (3) participation by the parties in the control or management of the enterprise.'" *Kansallis Finance Ltd. v. Fern,* 40 F.3d 476, 478-79 (1st Cir. 1994) (quoting *Fenton v. Bryan,* 604 N.E.2d 56 (Mass. App. Ct. 1992)). "It is well settled that partners owe each other a fiduciary duty of 'the utmost good faith and loyalty.'" *Meehan v. Shaughnessy*, 535 N.E.2d 1255, 1263 (Mass. 1989) (quoting *Cardullo v. 434 Landau,* 105 N.E.2d 843 (Mass. 1952) (additional citations omitted). "As a fiduciary, a partner must consider his or her partners' welfare, and refrain from acting for purely private gain." *Id.* (additional citations omitted).[4]

Here, the facts as alleged show that in March of 2012 Gregory and Jason made a plan to jointly form a hedge fund. Many of the details of this plan were expressed in an email chain dated March 28, 2012, in which Jason and Gregory discussed the structure of the fund, the name of the fund, their roles within the fund, the website for the fund, fundraising, and payment of set-up fees.

---

[4] For the purposes of this motion, it does not matter whether the hedge fund is considered a partnership or a joint venture; "[j]oint venturers owe one another substantially the same fiduciary duties as are owed by partners to one another." *Zimmerman v. Bogoff*, 524 N.E.2d 849, 855 (Mass. 1988) (citing *DeCotis v. D'Antona,* 168, 214 N.E.2d 21 (Mass. 1966)).

At the beginning of this email chain, Gregory wrote: "I have instructed the lawyer to proceed with forming the fund 'The Lemelson Partnership[.]' The fund should be ready to receive capital in approximately 2-4 weeks (may be closer to 4 weeks due to trip to Hong Kong). Feel free to use this timeline in any preliminary discussions you may have with prospective investors." (Docket No. 16-10 at 3-4.)

The facts pled in the complaint and in this email chain may be sufficient to show a plausible claim that Jason and Gregory formed a partnership to start a hedge fund. I need not decide this issue, however, because even if a partnership had been formed, Gregory has not pled sufficient facts to show that Jason breached any fiduciary duties owed to him in his capacity as a fellow partner. Pursuant to Mass. Gen. Laws ch. 108A, § 31, dissolution of a partnership may be caused: "(1) Without violation of the agreement between the partners, . . . (b) By the express will of any partner when no definite term or particular undertaking is specified . . . ."; *see Meehan*, 535 N.E.2d at 1260; *Johnson v. Kennedy*, 214 N.E.2d 276, 278 (Mass. 1966). Gregory does not allege, and the emails do not reveal, that he and Jason agreed to participate in the hedge fund for a particular period of time; thus, Jason had the right to lawfully terminate the venture at will, and his doing so did not constitute a breach of fiduciary duty. *See Johnson*, 214 N.E.2d at 278.

Regarding Jason's later actions of taking credit for Gregory's successful investment strategies to benefit Jason's new hedge fund, Spektra Fund, LP, Gregory has not asserted that these actions related to the proposed hedge fund conceived by the brothers in March of 2012. Jason published a press release to promote Spektra Fund, LP, in which he took sole credit for the spectacular record of his own portfolio, when in reality that credit was due to Gregory. However, the successful investment strategies at issue were employed in Jason's personal portfolio, not in the management of the joint hedge fund proposed in March of 2012. Although Gregory's success

15

in managing Jason's portfolio may have provided the impetus for the parties to form a joint hedge fund, Gregory has not alleged that the joint fund ever became operable. Furthermore, the press release was distributed nearly three years after Jason decided to stop pursuing the joint hedge fund project. At that point, even if a partnership or joint venture relationship had been formed earlier, Jason no longer owed Gregory a fiduciary duty. *See DeCotis v. D'Antona*, 214 N.E.2d 21, 22-23 (Mass. 1966). Thus, Jason's actions in falsely taking credit for Gregory's success did not involve the alleged partnership and did not constitute a breach of fiduciary duty in relation to this partnership, if such partnership existed. Accordingly, Defendant's motion to dismiss is granted with regard to count IV of Plaintiff's complaint.

## Conclusion

For the foregoing reasons, the Motion by Defendant Jason D. Lemelson to Dismiss Complaint (Docket No. 14) is ***granted***, and all counts are hereby dismissed.

**SO ORDERED.**

*/s/ Timothy S. Hillman*
**TIMOTHY S. HILLMAN**
**DISTRICT JUDGE**